

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-26-00218-CR

_____

EX PARTE SUNIL KESHAVAN NAIR

On Appeal from Criminal District Court No. 4
Tarrant County, Texas
Trial Court No. 1917878

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

This habeas appeal arises out of an alleged gold-bar scam that we have discussed in previous cases.[1] In this case, Appellant Sunil Keshavan Nair contends that the trial court's setting of a total bond of $15,075,000 on two counts—$75,000 on Count One and $15 million on Count Two—is excessive. The State concedes that the Count Two amount constitutes "an exorbitantly high bond"—as it has done in two other related habeas appeals involving the same trial court's setting of bonds in the same gold-bar scam.[2] After reviewing the record, agreeing that the total $15,075,000 bond amount is excessive, we will reverse.

## I. Background

On April 24, 2026, Nair was arrested for engaging in organized criminal activity (Count One) and financial abuse of the elderly over $150,000 (Count Two). The trial court set Nair's bond at $15 million on Count One and $15 million on Count Two. Arguing that the combined $30 million bond was unreasonable and excessive, Nair

---

[1]*See Ex parte Sajwani*, No. 02-26-00216-CR, slip op. at 2 (Tex. App.—Fort Worth Aug. 6, 2026, no pet.) (mem. op., not designated for publication) (reversing habeas order denying relief concerning a $7.5 million bond set on Count Two after the $7.5 million bond on Count One was reduced to $75,000); *Ex parte Malani*, Nos. 02-26-00153-CR, 02-26-00154-CR, 2026 WL 2206735, at *8 (Tex. App.—Fort Worth July 30, 2026, no pet.) (mem. op., not designated for publication) (reversing habeas order denying relief on offenses involving aggregate bonds of $25 million and $30 million after defendants were indicted as part of the gold-bar scam).

[2]*See Sajwani*, slip op. at 3; Brief for State at 17, *Ex parte Charani*, No. 02-26-00093-CR (Tex. App.—Fort Worth July 10, 2026).

filed a motion to reduce both bond amounts and an application for a writ of habeas corpus.

The trial court conducted a hearing at which Nair's daughter and a bail bondsman both testified. At the hearing's conclusion, the trial court lowered the bond amount on Count One from $15 million to $75,000 but denied Nair's request to lower the $15 million bond amount on Count Two. Nair has appealed.

## II. Discussion

We need not again set forth the general factual overview of the alleged gold-bar scam or the well-settled governing law and standard of review, all of which we have now twice stated in our prior related opinions.[3] *See Sajwani*, slip op. at 6; *Malani*, 2026 WL 2206735, at *1–2. Rather, we move straight to analyzing the evidence presented at the bond-reduction hearing under the governing guidelines. *See* Tex. Code Crim. Proc. art. 17.15(a); *Ex parte Rubac*, 611 S.W.2d 848, 849–50 (Tex. Crim. App. [Panel Op.] 1981); *Chavez v. State*, 671 S.W.3d 775, 785 (Tex. App.—Fort Worth 2023, no pet.).

### A. The nature of Nair's offense and potential sentence

When assessing the reasonableness of a bond amount, the Court of Criminal Appeals has instructed that the "primary factors" are the punishments that can be

---

[3]We are required to "hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to" the appeal's final disposition. Tex. R. App. P. 47.1.

imposed and the nature of the offenses. *See Rubac*, 611 S.W.2d at 849. In this case, Nair has been charged with serious financial crimes: engaging in organized criminal activity and financial abuse of the elderly. The State has pointed out that the punishment for engaging in organized criminal activity is fifteen to ninety-nine years or life, in prison, Tex. Penal Code § 71.02(a)(8), (b)(2), and for financial abuse of the elderly is five to 99 years, or life, in prison, *id.* §§ 32.55(c), (d)(6).

But just as was the case in *Sajwani*, slip op. at 6–7, and *Malani*, 2026 WL 2206735, at *2–3, the evidence presented at the bond-reduction hearing was weak regarding Nair's connection to the alleged offenses. The State called no witnesses at the hearing and offered only one piece of evidence: Nair's arrest warrant and the supporting affidavit. Other than stating Nair's name on page one, the 98-page arrest-warrant affidavit first mentioned him on page 96 and provided facts specific to him only on page 97.

The affidavit stated that Nair had bought gold and "took $1 bills from people off the street and [that] those same people [had] either dropped off gold and cash or [had] picked up gold and cash." It further stated that investigators knew that the $1 bills were "[t]okens of the Hawala network"—a "network for moving cash, gold, and silver in an untraceable fashion." Finally, the affidavit alleged that "if people brought in gold to sale[,] [sic] there was never a transaction recorded and that [Nair] would negotiate then go get the cash from the owners of Malani's to pay for the gold."

4

As Nair argues in his brief, "Buying gold is not illegal." [Emphasis omitted.] He challenges the lack of factual detail in the affidavit and specifically questions the allegations in the arrest affidavit as compared to the indictment. For instance, Count One in the indictment reads that Nair "did with the intent to establish, maintain, or participate in a combination or in the profits of a combination commit the offense of theft of property, namely money, valued at more than $30,000 but less th[a]n $150,000, from Clifton Richard, an elderly individual." Nowhere is Richard's name listed in the arrest-warrant affidavit. Nor did the State offer any evidence at the habeas hearing connecting Nair to Richard.

Similarly, regarding Count Two, the indictment listed 15 specific complainants, including Richard. And the State offered no evidence at the habeas hearing connecting Nair to any specific complainant or their allegedly stolen property. In the State's closing argument, arguing in favor of keeping the combined $30 million bond amounts, it argued that the loss amount in the case was "up to maybe $132 million," but it did not offer any evidence tying that specific loss amount to Nair individually.[4]

Although Texas courts have upheld relatively high bond amounts when the crimes at issue involve large quantities of off-the-books cash or are connected to a broader criminal network that suggests the involvement of "monied backers," *see*

---

[4]On cross-examination, Nair's daughter stated that she was aware that the victims from the case were claiming a $132 million loss. But she specifically testified that her parents "just work there"—at Malani's—and "have nothing to do with that."

*Malani*, 2026 WL 2206735, at *3 (collecting cases), the State's affidavit contains little evidence that Nair was a knowing participant in the larger fraud scheme. We would expect that the State can—and presumably will—produce significantly more evidence at trial. But the record that is before us—and that was before the trial court—is sparse regarding Nair's participation in the fraud scheme. *See Sajwani*, slip op. at 11; *Malani*, 2026 WL 2206735, at *4.

Accordingly, this bond consideration does not weigh in favor of a particularly high bond, much less a $15,075,000 collective bond. *See Sajwani*, slip op. at 11; *Malani*, 2026 WL 2206735, at *4.

## B. Nair's lack of criminal history

The State put on no evidence that Nair has a criminal history. *See* Tex. Code Crim. Proc. art. 17.15(a)(6). Before this case, he had never been arrested and had never even received a traffic citation. The absence of any evidence of any criminal history militates against a high bond amount. *See Sajwani*, slip op. at 11; *Malani*, 2026 WL 2206735, at *5.

## C. Nair's citizenship status, community ties, employment record, and medical issues

We next consider Nair's citizenship status, his family ties, work record, and medical issues connecting him to North Texas. *See* Tex. Code Crim. Proc. art. 17.15(a)(7); *Rubac*, 611 S.W.3d at 849–50. Nair came to the United States in 2012 and has continuously lived in the North Texas area. When Nair became a United States

citizen in 2021, he renounced his Indian citizenship and gave up his Indian passport. Nair's daughter testified that he has an American passport—which is in her possession—and Nair's counsel offered for it to be held in the trial court's registry during the pendency of this case. Notably, the State has not argued that Nair is a flight risk—either at the bond-reduction hearing or on appeal.

Nair is married and has a wife and son. His mother has lived in the North Texas area for 40 years and relies on Nair to help care for her. Nair lives with his wife in a house that his son owns and has maintained stable employment his entire adult life. Nair does not travel outside of the North Texas area.

According to Nair's daughter, he lives a modest lifestyle. He has no money or assets anywhere outside the North Texas area. A typical day consists of going to work, spending time with his family, and going to medical appointments because of his serious health issues.

Concerning his health, Nair has a diabetic condition that causes blood clotting in his eyes and requires repeated surgeries every few months to prevent visual impairment and potential blindness. Since being arrested—and the trial court's refusing to lower both bond amounts—Nair's diabetic symptoms have worsened while he has been in jail because the jail does not carry his prescribed diabetes medication and provides him a generic drug.

These considerations do not support a high bond amount.

**D. The government's interests**

As in *Sajwani*, slip op. at 12, and *Malani*, 2026 WL 2206735, at \*5–6, the bond conditions related to the government's interests do not support a high bond amount either. *See* Tex. Code Crim. Proc. art. 17.15(a)(1), (5) (requiring court to determine the amount and conditions "sufficient to give reasonable assurance that the undertaking will be complied with" and to consider "[t]he future safety of a victim of the alleged offense, law enforcement, and the community"). The trial court's bond conditions are more than adequate to protect the community's safety and ensure Nair's appearance at trial, without the need for an exorbitant bond. *See Sajwani*, slip op. at 12–13 (first citing *Malani*, 2026 WL 2206735, at \*6; then citing Tex. Code Crim. Proc. art. 17.028(b); and then citing *Ex parte Durst*, 148 S.W.3d 496, 501 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (op. on reh'g)).

As a preliminary matter, again, the State's affidavit does not show that Nair was aware of the nationwide fraud scheme. But even if he had been aware, the initial bond conditions—which Nair does not challenge—ensure that he cannot participate in the scheme if he is released on bond. Those conditions require Nair to, among other things, (1) fully participate in and comply with the rules and requirements of the Community Supervision and Corrections Department (CSCD) electronic-monitoring programs; (2) not leave Tarrant or Dallas County without the trial court's written permission; (3) have no contact with co-defendants; (4) not access the internet without approved monitoring software; (5) surrender his passport to the court's

8

registry within 24 hours of release; (6) stay 500 feet away from involved jewelry-store locations; and (7) maintain a job or enroll in full-time school.

The trial court's bond conditions are thus more than adequate to prevent Nair from participating in the nationwide fraud scheme while out on bond and to ensure that he appears at trial. *See Sajwani*, slip op. at 14; *Malani*, 2026 WL 2206735, at \*6. Accordingly, the government's interests do not support a high bond amount.

### E. Nair's ability to pay

Regarding Nair's ability to pay the bond amount, the State concedes that the record supports "a far lesser bond." *See Sajwani*, slip op. at 14 ("Whether bail is oppressive or not depends on the defendant's financial circumstances; bail is oppressive if it is set in an amount higher than the defendant can afford for the purposes of forcing him to remain incarcerated." (quoting *Ex parte Howell*, No. 02-26-00134-CR, 2026 WL 2066046, at \*3 (Tex. App.—Fort Worth July 16, 2026, no pet. h.) (mem. op., not designated for publication))). Nair and his wife own no real estate, automobiles, or securities. At the time of the habeas hearing, their joint bank account contained approximately $41,000, which he characterizes in his appellate brief as being "every penny to their name."

Since 2016, he has earned on average around $33,000 per year, starting at $19,550 in 2016 and earning just over $41,200 in 2025. At the time of his arrest,

Malani's paid Nair $27.50 an hour, and he made around $1,660 every two weeks.[5] Malani's did not provide him with any benefits, including paid time off or health insurance, and his daughter estimated that Nair paid $600 to $700 a month for health insurance.

Nair's daughter testified that his family could collectively raise $40,000 on his behalf. But on appeal, the State has not even suggested that a bond should be set that would require all of that money—instead suggesting that the amount on Count Two should be reduced to $75,000, which is the Count One amount.

The trial court was free to disbelieve Nair's daughter's testimony regarding his finances, but it must not speculate without evidentiary support. *See Sajwani*, slip op. at 15 (citing *Chavez*, 671 S.W.3d at 789); *Malani*, 2026 WL 2206735, at *7. Apart from the fraud network described in the State's affidavit—an affidavit that barely mentions Nair—there is no evidence that he has access to sufficient funds to cover the $15,075,000 bond amounts.

But even if Nair had an unknown amount of additional wealth, it would not justify the $15,075,000 bond amounts here. "Just as a defendant's inability to afford b[ond] does not, in itself, demonstrate that b[ond] is excessive, a defendant's ability to afford [a high bond] in the amount set does not in itself justify b[ond] in that

---

[5]His wife also worked part-time at Malani's, earning $13 an hour.

10

amount." *Malani*, 2026 WL 2206735, at \*7 (quoting *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd)).

Accordingly, we conclude that like the other bond considerations, Nair's ability to pay does not support the $15,075,000 bond amounts.

## F. Summary

Applying the governing guidelines, *see* Tex. Code Crim. Proc. art. 17.15(a); *Rubac*, 611 S.W.2d at 849–50; *Chavez*, 671 S.W.3d at 785, we conclude that the evidence does not support the collective $15,075,000 bond amounts because (1) the nature of the alleged offense is vague, and the evidence is weak; (2) Nair has no known criminal history; (3) he is a United States citizen; (4) he has both family and employment ties to North Texas; (5) he has medical needs better suited for treatment by his personal healthcare providers outside of the jail; (6) the trial court's bond conditions are more than sufficient to protect the community; and (7) his liquid assets approximate $41,000. Accordingly, after considering the evidence and relevant factors and affording Nair the presumption of innocence to which he is constitutionally entitled, we conclude the trial court erred by denying Nair's application to reduce his cumulative $15,075,000 bond amounts. *See Ex parte Ramirez-Hernandez*, 642 S.W.3d 907, 924 (Tex. App.—San Antonio 2022, no pet.).

We therefore sustain Nair's sole issue.

## III. Conclusion

Having sustained Nair's sole issue, we reverse the trial court's order on Nair's bond-reduction motion and habeas application and remand the case to the trial court to set reasonable, non-excessive bond amounts.[6] *See Sajwani*, slip op. at 16; *Malani*, 2026 WL 2206735, at *8.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  August 6, 2026

---

[6]Because Nair framed his appeal as challenging the collective bond amount, we do not pass on the propriety of the individual $75,000 amount for Count One—other than to say that it and the $15 million bond on Count Two collectively constitute an unreasonable, excessive total bond amount.